IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CRAIG DEON COWARD, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 4:15-CV-00611-ODS |
| | ) |
| IAN WALLACE, | ) |
| | ) |
| Respondent. | ) |

ORDER AND OPINION (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS,
(2) DENYING ISSUANCE OF CERTIFICATE OF APPEALABILITY,
AND (3) DISMISSING MATTER WITH PREJUDICE

Pending is Petitioner Craig Deon Coward's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.

I. BACKGROUND

The underlying facts were summarized by the Missouri Court of Appeals as follows:

> Coward's conviction arose from a series of incidents between June 18 and June 22, 2008. Coward and the assault victim, S.C., began dating in March 2008. On June 18, 2008, after driving around together in S.C.'s car, S.C. and Coward returned to his residence. When she pulled into the driveway and started to get out of the car, Coward accused her of sleeping around and putting methamphetamine in his car. He hit her in the nose with his fist, causing it to bleed. She begged him to stop. He reached behind the seat, grabbed a bat, and broke her windshield. As Coward continued to scream accusations at S.C., he reached between the seats, pulled out a knife, and slashed the dash of her car. Coward then broke a compact disc and said that he did not need to use those other items because the compact disc would work just as well. S.C. testified that she thought Coward was talking about killing her.
>
> Coward exited the car, came around to the driver's side, opened the door, grabbed S.C. by the hair, and dragged her into the house. While dragging her to his room, he continued to make accusations and beat her head with his fist. Eventually, Coward left the room. S.C. did not try to leave because she was scared. When Coward returned, he claimed to

have found more drugs in his car and wanted to know why S.C. was trying to set him up. Another resident at the house, Becky Wilhelm, observed Coward hitting S.C. in the face and burning S.C.'s face with a cigarette.

Coward told S.C. to call the Lake Winnebago police department and make a police report. He was standing next to her, writing down what she was to say: that Jeremy McAllister, a former resident of the house, had raped and beat her.

On June 19, the next day, S.C. called in to work and, at Coward's direction, told them that McAllister had assaulted her. Also at Coward's direction, S.C. called her employer a second time and authorized them to release her paycheck to Wilhelm. Coward made S.C. go to the bank with him and Wilhelm to cash the check; Coward kept the money. On that day, S.C.'s eye was black and swollen, she had two cigarette burn marks on her face, and she was barely able to move her jaw. S.C. did not try to leave on June 19 because she was scared, and she did not try to call the police because she was kept in a room with no telephone.

On June 20, S.C. begged Coward to take her to the doctor because she thought her jaw was broken. Coward and Wilhelm took S.C. to a doctor's office in Harrisonville. Coward told her to say that she had been beaten by McAllister. The nurse practitioner told S.C. to go to the medical center for x-rays, but Coward would not let her go and took her back to his house instead. That evening, S.C.'s best friend came to visit her. Coward told S.C. her friend was outside and to get rid of her. S.C.'s eyes were almost swollen shut, she could barely open her mouth, and she had extensive bruising. Coward followed S.C. out of the house and told S.C. to tell her friend that McAllister did it. Later, Coward and others took S.C. to a hotel and left her there for several hours. She did not try to leave because she was scared. When Coward returned, he accused S.C. of having someone in the room and starting beating her face and head and tearing the room apart. After leaving the hotel, Coward continued to beat S.C. in the car. He then stopped the car and accused S.C. of wearing a wire. She got out of the car and stripped to show that she was not wearing one.

On June 22, 2008, S.C. was very weak and sick and begged to go to the hospital. Coward hit her on the leg with a bat and stepped on her ankle, knocking her to the floor. S.C. begged Wilhelm to take her to the hospital. Wilhelm and Coward dragged S.C. into the living room. S.C. heard the owner of the house ask what happened to her. Coward told the owner that S.C. had had a seizure and had fallen.

Coward and Wilhelm took S.C. to Research Hospital in Kansas City. Wilhelm surmised that Coward picked Research to avoid the police.

2

S.C.'s eyes were swollen shut; during the drive to the hospital, Coward told her that, when she got to the hospital, she was to say that McAllister had assaulted her.

At Research Hospital, S.C. talked to Kansas City, Missouri, police officers and told them that she had been raped and beaten by McAllister because that is what Coward told her to say. She also told them that she had been beaten in a Harrisonville park because Coward told her to say that. S.C. was interviewed by a Harrisonville detective. She told him that McAllister caused her injuries, but the detective did not believe her. She finally told him the truth—that Coward had beaten her for five days and that he had threatened to kill her and her family. S.C. was in the hospital for five days and in intensive care for three days. She still had bruises and swelling when she was discharged. A CT scan revealed that S.C. had a fractured nasal bone and brain hemorrhaging. Doctors recommended that she undergo plastic surgery but that she would need to wait at least a year for her face to heal. At the time of trial, February 18-20, 2009, S.C. still had not recovered. She had nerve damage in her upper eye, a scar by her eyebrow, and scars from the cigarette burns.

After Coward was arrested, he spoke to Wilhelm on the telephone from the jail, and the calls were recorded. The jury heard recordings of these two calls.

During the first call heard by the jury, Coward told Wilhelm that he had heard that S.C. had not suffered any broken bones, so that the worst he could be charged with would be simple battery. In the second phone call, Coward told Wilhelm to "third party" S.C. into the phone conversation. Coward told Wilhelm that he did not think that S.C. understood that "they" were trying to give him "thirty to life." Wilhelm asked Coward what she was supposed to say when she made the call, and Coward replied: "Well…you know…hey…. What happened was f—ked up, or whatever, but I think probation and maybe some restitution is more than appropriate."

During the second phone call heard by the jury, when S.C. answered her phone, Coward told her that "they" were trying to put him in prison or thirty years to life over "this." Coward informed S.C. that he had told "them" that he would not mind "taking probation, doing all the classes, paying all the restitution, [and] making sure the bills get paid." Coward asked S.C. if that disposition would be acceptable to her. When S.C. responded, "I guess," Coward said, "What do you mean, you 'guess'? They want to put me in here for thirty to life." When S.C. said that she was not sure what she was going to do, Coward said, "I didn't mean for this to be like this." He said, "Can't I just have the probation, do the classes like you marked on the sheet, and pay the restitution?"

3

> After the State rested and Coward's witnesses testified, Coward's attorney asked the trial court to take judicial notice of an *ex parte* order that was not on his evidence list. The trial court questioned its relevance. Coward's attorney suggested that it was relevant but did not ultimately pursue the matter further with the trial court. Coward did not testify.
>
> At the close of the evidence and arguments, the jury found Coward guilty as charged of first-degree domestic assault. The trial court sentenced Coward to twenty years in the Missouri Department of Corrections.

Doc. #4-9, at 3-7. Petitioner appealed his conviction to the Missouri Court of Appeals, and his conviction was affirmed. Doc. #4-9.

Petitioner sought post-conviction relief under Missouri Supreme Court Rule 29.15. He appealed the trial court's denial of a motion to vacate his conviction, arguing that his trial counsel failed to investigate the records custodian at UMB Bank as a potential witness and failed to obtain video surveillance from UMB Bank and Bank Midwest. Doc. #4-11. Petitioner argued that the video surveillance would have provided an alibi, raised reasonable doubt that he was the culprit of the alleged domestic abuse, and would have cast doubt as to the credibility of two of the State's witnesses. *Id.*, at 2, 8-16. The Missouri Court of Appeals affirmed the trial court's decision. Doc. #4-13, 2-7.

Petitioner articulates three bases for his Petition in this Court: (1) the trial court erred in failing to take judicial notice of or admit an ex parte order filed by S.C. against Petitioner; (2) trial counsel was ineffective by failing to reasonably investigate and present alibi evidence; and (3) trial counsel was ineffective by mentioning Petitioner's uncharged prior drug use during cross-examination of S.C. and in closing arguments. Doc. #1, at 5-8; Doc. #10, at 15-30.

## II. STANDARD

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which amended 28 U.S.C. § 2254, a writ of habeas corpus shall not be issued on a claim litigated on the merits in state court unless the state court's decision either:

4

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The "contrary to" and "unreasonable application" provisions in the first subsection have independent meaning. The "contrary to" provision applies "if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or reached a decision contrary to Supreme Court precedent when confronting facts that were materially indistinguishable." *Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011). The "unreasonable application" clause applies "if the state court correctly identified the governing legal principle, but unreasonably applied it to the facts of the particular case." *Id*.

Section 2254(d) "limits the applicability of the AEDPA's deferential standard to claims that have been 'adjudicated on the merits' in state court." *Worthington v. Roper*, 631 F.3d 487, 495 (8th Cir. 2011) (citation omitted). Federal courts are "directed to undertake only a limited and deferential review of underlying state court decisions." *Id*. (quoting *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007)). "A federal court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. (internal quotations and citations omitted).

### III. DISCUSSION

*A. Ineffective Assistance of Counsel*

Two of the three grounds set forth by Petitioner pertain to trial counsel's ineffectiveness. Issues of ineffectiveness of trial counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "This standard requires [the applicant] to show that his 'trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence, and that the deficient performance prejudiced his defense.'" *Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir. 1995), *cert.*

5

*denied*, 517 U.S. 1214 (1996) (quoting *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992)). This analysis contains two components: a performance prong and a prejudice prong.

> Under the performance prong, the court must apply an objective standard and "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. *Id.* at 689. Assuming the performance was deficient, the prejudice prong "requires proof 'that there is a reasonable probability that, but for a counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lawrence*, 961 F.2d at 115 (quoting *Strickland*, 466 U.S. at 694).

*Id.* Failure to satisfy both prongs is fatal to the claim. *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997) (stating there is no need to "reach the performance prong if we determine that the defendant suffered no prejudice from the alleged ineffectiveness"); *see also DeRoo v. U.S.*, 223 F.3d 919, 925 (8th Cir. 2000). "An ineffective assistance of counsel claim is a mixed question of law and fact." *McReynolds v. Kemna*, 208 F.3d 721, 723 (8th Cir. 2000). Consequently, the state courts' findings of historical fact are entitled to a presumption of correctness, and their application of *Strickland* to those facts must stand unless they applied those standards in an unreasonable manner.

(1) <u>Failure to Present Purported Alibi Evidence</u>

Petitioner argues, as he did during his post-conviction proceedings, that his trial counsel was ineffective for failing to investigate and present bank surveillance tapes and withdrawal records from Bank Midwest in Belton, Missouri, and UMB Bank in Lee's Summit, Missouri. Doc. #1, at 6; Doc. #10, at 2, 22-23; *see also* Doc. #4-11. Petitioner contends the surveillance footage from the ATMs at these banks as well as the testimony of the bank records custodians would establish he made withdrawals at the banks during the time he was allegedly confining and assaulting S.C.: June 18, 2008 through June 22, 2008. Doc. #1, at 6; Doc. #10, at 2, 22-23. He argues the evidence "would have provided at least some viable support to the defense, who could have argued that the time of the ATM withdrawals did not correspond with the state's timeline of events." Doc. #10, at 23.

6

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Worthington*, 631 F.3d at 498 (citing *Strickland*, 466 U.S. at 687-88). There are a variety of circumstances facing counsel during trial, and a court's "hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgment." *Id.* (citations and quotations omitted). Accordingly, this Court's review of the state court's determination is "twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel." *Id.* (citations omitted).

The Missouri Court of Appeals concluded that trial counsel was not ineffective for failing to obtain video footage from UMB or failing to call records custodians for the banks. Doc. #4-13, at 4-7. The Missouri Court of Appeals found that Petitioner, at the evidentiary hearing, failed to present testimony from the bank records custody and failed to offer ATM records that his trial counsel failed to admit at trial. *Id.* at 4. Rather, Petitioner relied upon speculation to support his argument. *Id.* at 5. The Missouri Court of Appeals also concluded Petitioner failed to refute the reasonableness of Petitioner's trial counsel's decision to forego additional investigation into the banks' video footage or records, and he failed to show prejudice resulting from his trial counsel's decision not to obtain video footage or bank records. *Id.* at 6-7.

This Court must determine whether the decision of the Missouri Court of Appeals is either contrary to or involved an unreasonable application of clearly established law, or was "based on" an unreasonable determination of fact. Based upon its review of the Record and applicable law, the Court concludes the Missouri Court of Appeals applied the proper standard. That is, the Missouri Court of Appeals analyzed whether (1) "trial counsel's performance was deficient because it fell below the level of a reasonably competent attorney in similar circumstances"; and (2) "this deficiency prejudiced" Petitioner. Doc. #4-13, at 5; *see also Strickland*, 466 U.S. at 687-95; *Nave*, 62 F.3d at 1035. Further, the Court concludes that the decision of the Missouri Court of Appeals was not based on an unreasonable determination of fact. Thus, this claim is denied.

### (2) Petitioner's Drug Use

Petitioner contends trial counsel was ineffective by failing to object to and injecting into evidence Petitioner's uncharged prior drug use during the cross-examination of S.C. and during closing arguments. Doc. #1, at 8; Doc. #10, at 2, 23-26. Petitioner concedes this ground was not raised during post-conviction proceeding. *Id.* "A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim." *Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995). "If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default." *Id.*

Petitioner argues that pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), this claim may still be raised because his post-conviction counsel's omission of this claim was ineffective under *Strickland*, and the omitted claim is substantial and meritorious. In *Martinez*, the Supreme Court held that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320.[1]

While *Martinez* recognized this exception, it did not change the rule that ineffective assistance of post-conviction appellate counsel could not constitute cause to excuse a state procedural default. *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) (stating "*Martinez* offers no support, however, for the contention that the failure to preserve claims on appeal from a postconviction proceeding can constitute cause."). Here, Petitioner's post-conviction counsel did not raise this issue with the circuit court. Doc. #4-10, at 8-28. Then, Petitioner's post-conviction appeal counsel did not raise this issue with the appellate court. Doc. #4-11. Thus, *Martinez* does not apply, and Petitioner fails to establish a cause for his procedural default of this claim.[2] Petitioner

---

[1] Under Missouri law, ineffective assistance of trial counsel claims cannot be raised on direct appeal. *See State v. Taylor*, 1 S.W.3d 610, 612 (Mo. Ct. App. 1999) (citation omitted).
[2] Even if *Martinez* did apply, Petitioner failed to demonstrate that his trial counsel "fell below an objective standard of reasonableness" and that "the deficient performance"

8

Case 4:15-cv-00611-ODS   Document 11   Filed 04/13/16   Page 8 of 11

also fails to show that a fundamental miscarriage of justice will result if his defaulted claim is not considered. *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006). As a result, this claim is denied.

### B. Ex Parte Order

Petitioner, as he did on direct appeal, claims the trial court erred in refusing to take judicial notice of or admit into evidence an *ex parte* order previously filed by S.C. against Petitioner. Doc. #1, at 5; Doc. #4-6, at 15-22; Doc. #10, at 15-22. Petitioner argues the *ex parte* order would have given a different context to admissions he made in the two phone calls that were played for the jury at trial. Doc. #10, at 16. Petitioner contends the admission of the *ex parte* order would have allowed him to argue that his admissions during these phone calls (specifically, his references to being placed on probation, being ordered to take some classes, and pay restitution) were not to the charged offense, but pertained to the *ex parte* order. *Id.*

After the State rested and Petitioner's witnesses testified, Petitioner's trial counsel asked the trial court to take judicial notice of an *ex parte* order S.C. had filed against Petitioner. Doc. #4-4, at 151. The trial court inquired as to its relevance, and trial counsel argued it was relevant to the tape recording that was played to the jury during trial, during which the boxes that S.C. had checked on the *ex parte* order were discussed. *Id.* at 151-52. The trial court stated: "I understand what you're trying to do but you are trying to put in evidence something that could have been asked when the witness was on the stand. The items you listed are part of the ex parte form. They are part of all ex parte orders." *Id.* at 152. Petitioner's trial counsel replied with "[u]nderstood, Your Honor. All right. Thank you, Your Honor." *Id.* Trial counsel did not mark the *ex parte* order as an exhibit or offer it into evidence.

---

actually prejudiced him. *Strickland*, 466 U.S. at 687-88. Petitioner has not established that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 694. Thus, there is no merit to Petitioner's underlying claim of ineffective assistance of counsel.

9

The Missouri Court of Appeals held this evidentiary claim was not properly preserved for review because Petitioner's trial counsel did not make an offer of proof. Doc. #4-9, at 7-8. Thus, the Missouri Court of Appeals could only review the issue for plain error. *Id.* at 8. Applying that standard, the Missouri Court of Appeals found there was no clear error, finding that Petitioner's trial counsel failed to demonstrate how the *ex parte* order was logically or legally relevant to Petitioner's defense. *Id.* at 8-9. The order was not relevant, according to the Missouri Court of Appeals, because it was merely cumulative of Coward's statement during the phone call that S.C. had marked boxes concerning classes and restitution on the *ex parte* order. *Id.* at 9. The Missouri Court of Appeals also noted that although Coward called S.C. as a defense witness at trial, she was not questioned about the ex parte order and the ex parte was not introduced through her testimony. *Id.*

Although the Missouri Court of Appeals addressed this issue based upon state evidentiary grounds, it did not address Petitioner's due process claim. Doc. #4-9. That is, in this matter, Petitioner argues the exclusion of this evidence violated the Sixth and Fourteenth Amendments of the United States Constitution. Doc. #10, at 16. Petitioner argues the Missouri Court of Appeals denied him "a crucial, alternative explanation of his recorded phone conversations…." because "[t]he *ex parte* order provides plausible support to the theory that [P]etitioner's alleged admissions during the phone calls were unrelated to the charged offense." *Id.* Because the Missouri Court of Appeals based its decision on state evidentiary grounds, this Court may review Petitioner's constitutional claim. *Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007) (citing *Taylor v. Bowersox*, 329 F.3d 963, 967-68 (8th Cir. 2003)) (noting the standard of review is less deferential when a Missouri court did not adjudicate a federal due process claim). This Court's review, however, is limited to whether "the exclusion of this evidence violated [P]etitioner's due process rights, regardless of the propriety of the court's action under state law." *Sweet v. Delo*, 125 F.3d 1144, 1157 (8th Cir. 1997) (citation omitted).

The exclusion of evidence at trial, based upon state evidentiary rules, "results in the denial of due process only if there was an impropriety so egregious that it made the entire proceeding fundamentally unfair." *Skillicorn*, 475 F.3d at 972 (citing *Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995)). "To meet this burden, a habeas petitioner

must show that 'absent the alleged impropriety the verdict probably would have been different." *Id.* (quoting *Anderson*, 44 F.3d at 679). Upon review of the Record, the Court finds that the exclusion of an *ex parte* order previously filed by S.C. was not an egregious impropriety, and it did not result in a fundamentally unfair proceeding. Further, Petitioner has not established that had the *ex parte* order been admitted, the verdict probably would have been different. Much evidence, including the testimony of S.C., established Petitioner had assaulted S.C. several times during the relevant period of time. Admission of a previous *ex parte* order filed by S.C. against Petitioner most certainly would not have resulted in Petitioner being found not guilty. Accordingly, this claim is denied.

## IV. CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because Petitioner has not met this standard, a certificate of appealability will be denied. *See* 28 U.S.C. § 2254, Rule 11(a).

## V. CONCLUSION

For these reasons, Petitioner's request for habeas corpus relief pursuant to 28 U.S.C. § 2254 is denied, the issuance of a certificate of appealability is denied, and this matter is dismissed with prejudice.

IT IS SO ORDERED.

DATE: April 13, 2016

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT